DISCIPLINARY COUNSEL *v.* BEELER.

[Cite as *Disciplinary Counsel v. Beeler,*
105 Ohio St.3d 188, 2005-Ohio-1143].

(No. 2004–1395—Submitted January 11, 2005—Decided March 30, 2005.)

---

LUNDBERG STRATTON, J.

{¶ 1} Respondent, Robert Logan Beeler, of Carey, Ohio, Attorney Registration No. 0002255, was admitted to the practice of law in Ohio in 1983. Respondent has been in the general practice of law since that time, predominantly practicing probate, tax, and real estate law.

{¶ 2} On March 12, 2004, relator, Disciplinary Counsel, filed an amended complaint against respondent alleging violations of the Code of Professional Responsibility arising out of his representation of various clients. Respondent and relator entered into joint stipulations regarding instances of fraud involving an estate and several wills and deeds. A panel of the Board of Commissioners on Grievances and Discipline heard the cause and, based on the parties' stipulations, testimony, and other evidence, made findings of fact, conclusions of law, and a recommendation.

### 1993 Will and Warranty Deeds

{¶ 3} In 1993, respondent prepared a will for Georgeann M. Kuenzli. This will bequeathed all of Kuenzli's property to her daughter, Jackie Predmore ("Predmore"), and to her grandchildren, John Brennan and Judilyn Ashley, if Predmore predeceased Kuenzli. Respondent also prepared two warranty deeds for Kuenzli in 1993. The first warranty deed purported to convey Kuenzli's residence on Orchard Lane to Predmore. The second purported to convey a rental property located on Warpole Street to Predmore.

{¶ 4} On February 1, 1993, Kuenzli signed the warranty deeds in the presence of respondent, who signed as a witness and notarized the deeds. Later, Nancy Todd, one of respondent's secretaries at the time, signed the 1993 will and the 1993 deeds as a witness outside the presence of Kuenzli. Respondent testified that he did this for the convenience of his client so that she would not have to return to his law office.

{¶ 5} Respondent retained the original warranty deeds in his possession until after Kuenzli's death. Respondent admitted that the deeds were not recorded until much later. Respondent was under the mistaken impression that a deed can be recorded anytime, because once recorded, it related back to the date on which it was signed. Respondent testified that he followed this practice as a cost-saving measure for his clients. Respondent also testified that at this time, he was drinking heavily.

## 1996 Wills

{¶ 6} In 1996, respondent drafted two more wills for Kuenzli. Kuenzli had asked respondent to ensure that her son-in-law, Gordon Predmore, was unable to benefit from her assets. Respondent drafted two new wills for Kuenzli and took them to her home.

{¶ 7} Respondent was present when Kuenzli signed both 1996 wills on December 28, 1996. Respondent instructed her to call him later and let him know which of the two wills she wanted to be valid. Respondent testified that he believed that Kuenzli never called.

{¶ 8} Respondent signed both 1996 wills as a witness in Kuenzli's presence. One of the 1996 wills, the "life estate" will, also bears the signature of Tamara Hunter, another former secretary of respondent. Hunter signed as a purported witness, out of the presence of the testator and at respondent's direction.

{¶ 9} The other 1996 will, the "trust will," bears the signatures of respondent and Brandi Griffin as witnesses. Griffin is respondent's current secretary. Out of the presence of the testator and at respondent's direction, Griffin signed the trust will purportedly as a witness. Both 1996 wills contain language revoking all prior wills and codicils by Kuenzli.

{¶ 10} The 1993 will and the 1996 wills remained in respondent's possession or under his control until after Kuenzli's death.

## 2000 Quitclaim Deed

{¶ 11} In August 2000, respondent prepared a quitclaim deed at Kuenzli's direction. The deed purported to convey Kuenzli's interest in a rental property on West Walker Street in Upper Sandusky to Predmore. Kuenzli reserved a life-estate interest for herself. Respondent witnessed Kuenzli's execution of the

quitclaim deed and signed it as a witness. Out of Kuenzli's presence and at respondent's direction, Hunter signed the quitclaim deed purportedly as a witness, and Griffin notarized it. Respondent retained the original in his possession until after Kuenzli's death.

{¶ 12} On November 30, 2000, Kuenzli died at the age of 98. Following her death, respondent met with Predmore, Ashley, and Brennan. After that meeting, respondent began to assist in administering the estate. On January 30, 2001, respondent presented the 1993 Orchard Lane and Warpole Street warranty deeds to the Wyandot County Recorder's Office for filing, believing that the transfers would relate back once the deeds were recorded, thus removing them from the corpus of the estate for purposes of probate.

{¶ 13} In February 2001, with the assent of the beneficiaries, respondent filed the 1993 will along with an application to probate the estate of Kuenzli and an application to relieve the estate from administration in the Wyandot County Probate Court. Respondent also prepared and filed a statement of the assets and liabilities of Kuenzli's estate. Respondent did not list the Orchard Lane, Warpole Street, or Walker Street properties as assets of the estate. On February 5, 2001, the probate court relieved the Kuenzli estate from administration.

### 2001 Warranty Deed

{¶ 14} Sometime before February 24, 2001, respondent realized that he needed Predmore's husband's signature to release his dower interest. On February 24, 2001, respondent presented Predmore and her husband with a warranty deed for their signatures. The warranty deed reserved life-estate interests in the Orchard Lane, Warpole Street, and Walker Street properties in favor of Predmore, and transferred equal remainder interests in the three properties to Ashley and Brennan. The Predmores signed the deed in respondent's presence and respondent signed as a witness and notarized the document. The February 24, 2001 warranty deed also bears the signature of Tamara Hunter. Out of the Predmores' presence and at respondent's direction, Hunter signed the warranty deed, purportedly as a witness. Respondent filed this deed with the county recorder four days later.

{¶ 15} Also on February 24, 2001, respondent presented Predmore with an affidavit for her signature. The affidavit stated that the quitclaim deed had been recorded. Respondent knew that the deed had not been recorded, yet he directed Predmore to sign it, notarized it himself, and filed the deed and the affidavit together several days later with the county recorder.

{¶ 16} Shortly thereafter, Predmore contacted respondent and explained that she wanted to retain the entire interest in the three properties. Predmore also

told respondent that she believed that the deeds had not been properly witnessed. After that conversation, respondent hired attorney Mark Ellis to represent him in matters pertaining to Predmore and the Kuenzli estate. Respondent met with Predmore and admitted that the deeds signed by Kuenzli and Kuenzli's wills were invalid.

{¶ 17} Later, in March 2002, Predmore's new attorney attempted to submit the 1996 life-estate will to probate court. Shortly after that, respondent attempted to file the 1996 trust will with the probate court. After respondent retained his attorney, he learned that the 1993 deeds and the 2000 quitclaim deed that he recorded after Kuenzli's death did not operate retroactively to transfer the property out of Kuenzli's estate.

## Settlement Agreement

{¶ 18} In July 2002, the Predmores, Ashley, Brennan, and Thomas Ashley (Judilyn Ashley's spouse) ("the heirs") entered into a settlement agreement with respondent and agreed to use the 1993 will to probate Kuenzli's estate. The heirs further agreed to a distribution of the various properties. Respondent agreed to waive all attorney fees related to the administration of the Kuenzli estate and agreed to help Ashley and Brennan to refinance the Walker Street property without charging them. Ashley and Brennan agreed to reimburse respondent $13,588.95 for Kuenzli's funeral bill and estate taxes, and respondent agreed to pay a total of $65,000 to Predmore (all of which has been paid) and $3,500 to Predmore's husband (which also has been paid). Finally, the heirs agreed to execute a release in favor of respondent from any legal malpractice claims arising from his representation of Kuenzli and the Kuenzli estate.

{¶ 19} In addition, respondent stipulated that there were other deeds and wills executed outside the presence of clients. Although he could not recall names, he believed that there were only a few.

## Hearing

{¶ 20} At the hearing, respondent testified that he is an alcoholic. He sought treatment with George Sakash, a mental-health and substance-abuse counselor, approximately 16 times in 1998 and three times in 2000. Although he experimented with attempting to drink in moderation, respondent testified that since December 2000, he has abstained from alcohol and is committed to total sobriety.

{¶ 21} In April 2004, two and a half weeks before his disciplinary hearing, respondent entered the Ohio Lawyers Assistance Program ("OLAP") support recovery system and signed a three-year contract with OLAP. Respondent testified that he intends to honor his OLAP contract. However, the contract requires attendance at a local weekly AA meeting, plus at least three other AA/NA meetings per week, for a total of four required meetings per week. As of

the hearing, having signed the contract two and a half weeks before, respondent had attended only two AA meetings total. In addition, an OLAP counselor told respondent that he needed a session with a therapist and his spouse regarding the disciplinary proceeding, and respondent had not completed this step as of the time of his hearing.

{¶ 22} George Sakash, respondent's mental-health and substance-abuse counselor, diagnosed respondent with alcohol dependence and a secondary diagnosis of generalized anxiety disorder. Since respondent stopped drinking, Sakash testified, he physically looks better, is more physically active, and has grown spiritually. In addition, Sakash testified that respondent's wife had confirmed that he was not drinking. However, Sakash was still concerned about respondent's level of anxiety and about the fact that he is still on anxiety medication.

{¶ 23} At the time of the hearing, Sakash did not believe that respondent had the support systems in place to help him handle high-stress periods. However, Sakash believed that the OLAP program will be positive for respondent, that respondent's alcohol dependence contributed to his disciplinary problems, and that he can successfully practice law.

### Disciplinary Counsel's Recommendation for Sanction

{¶ 24} At the conclusion of the hearing, relator recommended that respondent be suspended from the practice of law for two years with six months of the suspension stayed. Respondent requested that if a suspension is imposed, it be stayed in its entirety. The panel recommended a two-year suspension with six months stayed on conditions. The board recommended that respondent be suspended for two years with 21 months stayed upon the terms and conditions set forth in the panel's report. Relator filed objections, arguing that the three-month actual suspension recommended by the board is too lenient.

{¶ 25} Because the parties stipulated to the disciplinary violations, the sole issue before this court today is the sanction. In seeking to bring uniformity to the process of sanctioning attorneys, this court turned to the four-step methodology of the American Bar Association Standards for Imposing Lawyer Sanctions in *Disciplinary Counsel v. Brown* (1999), 87 Ohio St.3d 316, 720 N.E.2d 525. "First, the court is to determine which ethical *duties* were violated by the attorney. Second, the court examines the attorney's *mental state* at the time of the violations. Third, the court assesses the extent of the *actual or potential injury* caused by the lawyer's misconduct. Equipped with this information, the court makes an initial determination as to the appropriate sanction. Finally, in the fourth step, the court examines any *aggravating or mitigating circumstances* and arrives at a final determination." (Emphasis sic.) Id. at 320, 720 N.E.2d 525.

## Ethical Duties Violated

{¶ 26} The parties stipulated and the board determined that respondent's conduct violated DR 1–102(A)(4) (a lawyer shall not engage in conduct involving misrepresentation, dishonesty, fraud, or deceit), 1–102(A)(5) (a lawyer shall not engage in conduct prejudicial to the administration of justice), 1–102(A)(6) (a lawyer shall not engage in any conduct that adversely reflects on the lawyer's fitness to practice law), 6–101(A)(2) (a lawyer shall not handle a legal matter without preparation adequate in the circumstances), 6–101(A)(3) (a lawyer shall not neglect a legal matter entrusted to him), and 7–102(A)(3) (a lawyer shall not conceal or knowingly fail to disclose what he is required by law to reveal).

{¶ 27} Further, as stipulated by the parties and determined by the board, respondent's conduct as set forth in Count Two (directing his staff to sign as witnesses) violated DR 1–102(A)(4), 1–102(A)(5), and 1–102(A)(6).

## Respondent's Mental State

{¶ 28} R.C. 2107.03 requires at least two witnesses for the proper execution of a will. The witnesses must see the testator sign or hear the testator acknowledge the signature. Relator argues that respondent's mental state at the time of the violations was solely one of disdain for the law. We disagree. Respondent was drinking heavily during most of the time in question. Although he appears to have known that he was not properly witnessing Kuenzli's will and deeds, his failings seem to have grown out of confusion due to drinking and a concern for the convenience of his client, rather than any contempt for the law. While his behavior is clearly unacceptable and did indeed violate the Code of Professional Responsibility, his mental state was affected by his substance-abuse problems. Relator stipulated that respondent acted without a selfish or dishonest motive.

## Actual or Potential Injury

{¶ 29} Respondent's missteps caused Kuenzli to die intestate and the Kuenzli estate to linger in probate for many months. Further, by filing the improperly attested wills and deeds with the probate court, respondent misrepresented facts to that tribunal, an action which this court does not look upon lightly. "Beyond the fact that these activities are a fraud on the court where the documents are filed and on all those who rely on such documents, this casual attitude toward statutory requirements breeds disrespect for the law and for the legal profession." *Lorain Cty. Bar Assn. v. Papcke* (1998), 81 Ohio St.3d 91, 93–94, 689 N.E.2d 549.

## Aggravation and Mitigation

{¶ 30} Respondent has been practicing law since 1983 and has no prior disciplinary record. Respondent and relator stipulated that the following mitigat-

ing factors exist and should be considered in determining the appropriate sanction:

{¶ 31} "a) Absence of a prior disciplinary record;

{¶ 32} "b) Absence of a dishonest or selfish motive;

{¶ 33} "c) Timely good faith effort to make restitution and to rectify consequences of misconduct, including payment by Respondent from his own personal funds in the amount of $68,500;

{¶ 34} "d) Full and free disclosure and cooperative attitude toward these proceedings;

{¶ 35} "e) Remorse for his conduct and acknowledgement [sic] of wrongdoing;

{¶ 36} "f) A diagnosis by OLAP's Stephanie Krznarich, a licensed alcohol/substance abuse counselor and professional counselor, of (1) alcohol dependence in full remission and (2) generalized anxiety disorder;

{¶ 37} "g) A diagnosis by George Sakash, a licensed chemical dependency counselor and professional counselor * * *, of alcohol dependence that caused Respondent's judgment to be impaired and contributed to a portion of the misconduct set forth above;

{¶ 38} "h) Respondent treated with Sakash on 16 occasions in 1998; once in 1999; and six times in 2000. Respondent has treated with Sakash on two occasions in 2004. Respondent attended two AA meetings in 1998; and

{¶ 39} "i) Beginning on April 26, 2004, Respondent has agreed to participate in OLAP pursuant to the terms of OLAP's Lawyers Support System Recovery Contract * * * for at term of three (3) years, which includes monitoring Respondent's performance under the terms of the Contract by Scott Mote, Stephanie Krznarich and Roger Culbert."

{¶ 40} Thus, respondent has admitted to his substance-abuse problem and has committed to sobriety.

## Sanction

{¶ 41} Relator and respondent stipulated that any period of a stayed suspension should be accompanied by the following terms and conditions:

{¶ 42} "A term of probation that includes the following conditions: (1) monitoring, for a period of not less than two years, by a licensed attorney; (2) access to regular audits of Respondent's trust and business accounts by the monitor; and (3) client releases to allow the monitor to have full access to Respondent's client's [sic] files."

{¶ 43} As stated above, relator and respondent did not stipulate to a recommended sanction. The Board of Commissioners on Grievances and Discipline

adopted the findings of fact and conclusions of law of the panel, but recommended a two-year suspension with 21 months stayed, on the same conditions as stipulated, but with the additional condition of successful completion of the OLAP contract.

{¶ 44} A violation of DR 1–102(A)(4) ordinarily calls for the actual suspension of an attorney's license. See *Disciplinary Counsel v. Fowerbaugh* (1995), 74 Ohio St.3d 187, 190, 658 N.E.2d 237. The purpose of the disciplinary process is not to punish the offender but rather to protect the public. *Disciplinary Counsel v. O'Neill*, 103 Ohio St.3d 204, 2004-Ohio-4704, 815 N.E.2d 286, at ¶ 53.

{¶ 45} However, we find that a six-month actual suspension is more in line with conduct in similar cases. In *Disciplinary Counsel v. Heffter*, 98 Ohio St.3d 320, 2003-Ohio-775, 784 N.E.2d 693, we held that a six-month actual suspension was warranted when Heffter notarized signatures of minors in a probate matter outside their presence. In *Papcke*, 81 Ohio St.3d 91, 689 N.E.2d 549, we held that a six-month actual suspension was warranted when Papcke notarized her secretary's signing of a client's name without even asking whether the client had authorized the secretary to sign her name, told her client she had filed her complaint for divorce when she had not, and failed for six months to reply to relator's notice of investigation. In *Disciplinary Counsel v. Bandy* (1998), 81 Ohio St.3d 291, 690 N.E.2d 1280, we imposed a six-month actual suspension on an attorney for drafting a will for a client in which the attorney was named as a beneficiary, signing his own name as a witness, and later attempting to add another witness's signature to the will after the testator's death. Finally, in *Lake Cty. Bar Assn. v. Speros* (1995), 73 Ohio St.3d 101, 652 N.E.2d 681, we held that filing an affidavit in court bearing a forged signature of a notary and containing a false statement blaming failure to timely file a brief on a clerical error rather than his own neglect warranted six months' actual suspension.

{¶ 46} Accordingly, this court modifies the board's recommended sanction to a 24–month suspension with 18 months stayed, for a total of six months' actual suspension, on the following conditions: probation for a period of two years, monitoring by a licensed attorney during the term of probation, access to regular audits of respondent's trust and business accounts by the monitor, and client releases to allow the monitor to have full access to respondent's client files. In addition, because respondent admitted several instances of improper witnessing of documents, this court orders the respondent to review existing files to be certain that all documents have been properly witnessed and to cooperate with the monitor in correcting any outstanding improperly witnessed documents.

{¶ 47} If respondent violates the conditions, the stay will be lifted and respondent will serve the entire term of the actual suspension. Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., RESNICK, PFEIFER, O'CONNOR, O'DONNELL and LANZINGER, JJ., concur.

---

Jonathan E. Coughlan, Disciplinary Counsel, and Lori J. Brown, First Assistant Disciplinary Counsel, for relator.

Kegler, Brown, Hill & Ritter, Geoffrey Stern, Christopher J. Weber, and Rasheeda Z. Khan, for respondent.